# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Sep 30, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| INFORMATION ASSOCIATED WITH THE ) | Case No.   2:20-sw-0896-AC |
| CELLULAR TELEPHONE ASSIGNED ) | |
| CALL NUMBER  (916) 604-1056 ) | **SEALED** |
| ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1591(a)(1), (b)(2); 18 U.S.C. § 1952(a)(3); 18 U.S.C. § 2421 | Sex Trafficking of a Child;  Interstate Travel or Transportation in Aid of Racketeering Enterprises; the Mann Act |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☑ Delayed notice ___30___ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Matthew Catalano

*Applicant's  signature*

Matthew Catalano, FBI Special Agent

*Printed name and title*

Sworn to telephonically and signed pursuant to Fed. R Crim. P. 4.1.

Date:   9/30/2020

City and state:  Sacramento, California

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

MCGREGOR W. SCOTT
United States Attorney
BRIAN A. FOGERTY
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of: | CASE NO. |
| INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (916) 604-1056 | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE |
| | **UNDER SEAL** |

I, Matthew Catalano, being first duly sworn, hereby depose and state as follows:

## I.    **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (916) 604-1056 (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey.  The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested

1

1  warrant therefore includes all the information required to be included in an order pursuant to that statute.

2  See 18 U.S.C. § 3123(b)(1).

3      3.      I am a Special Agent with the Federal Bureau of Investigation, and have been since

4  March 2009. I am currently assigned to the Sacramento Division. While employed by the FBI, I have

5  investigated federal criminal violations related to, among other things, violent crimes, child exploitation,

6  and human trafficking. I have gained experience through training at the FBI Academy as well as

7  through my work related to conducting these types of investigations and others. In the course of my

8  career as a Special Agent, I have used and analyzed results for cell phones, pen registers, precise

9  location data search warrants, and cell tower analysis. Moreover, I am a federal law enforcement officer

10  who is engaged in enforcing criminal laws, including 18 U.S.C. § 1591(a)(1), Sex Trafficking of a

11  Child, and I am authorized to request a federal search warrant.

12      4.      The facts in this affidavit come from my personal observations, my training and

13  experience, and information obtained from other agents and witnesses. This affidavit is intended to

14  show merely that there is sufficient probable cause for the requested warrant and does not set forth all of

15  my knowledge about this matter.

16      5.      Based on the facts set forth in this affidavit, there is probable cause to believe that

17  violations of 18 U.S.C. §§ 1591(a)(1), (b)(2), Sex Trafficking of a Child, 18 U.S.C. § 1952(a)(3),

18  Interstate Travel or Transportation in Aid of Racketeering Enterprises, and 18 U.S.C. § 2421, the Mann

19  Act, have been committed, are being committed, and will be committed by Michael Anthony Butler, Jr.

20  There is also probable cause to believe that the location information described in Attachment B will

21  constitute evidence of these criminal violations.

22      6.      The court has jurisdiction to issue the proposed warrant because it is a "court of

23  competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the

24  United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

25

26          **II.**        **BACKGROUND REGARDING SEX TRAFFICKING**

27      7.      Through my training and experience, I am aware of the following traits of prostitution

28  and how the Internet is used to further the activities of illegal prostitution:

a.  Individuals who, through enticement, intimidation, or force, enlist individuals to become prostitutes, and who profit from the prostitution of others are called "pimps."

b.  Pimps, as well as prostitutes, have embraced the Internet as a means of advertising services and communicating with customers.

c.  Pimps often try to recruit new victims by using social media sites such as Facebook.com, Instagram and Snapchat.  Pimps often communicate with victims via social media applications after recruiting a victim to work for them.  Prostitutes working for the same pimp will often use social media to communicate with each other and their pimp.

d.  Certain websites have been created to facilitate communications between prostitutes and their clients.  The more notable websites formerly relevant to prostitution in the Eastern District of California include the "Adult" section of Backpage.com as well as nightshift.co.  New up and coming escort websites include Skipthegames.com, CityXGuide.com, Megapersonals.com, and Adultlook.com.  These websites allow pictures to be posted as part of advertisements.  I have viewed prostitution advertisements on each of these websites.

e.  Pimps attempt to avoid the attention of law enforcement through the anonymity provided by the Internet.

f.  Prostitutes are instructed by the pimp on how to detect undercover officers.  When arranging "dates" with clients over the phone, prostitutes rarely discuss the details regarding the sexual acts that are to occur.  Those more detailed discussion typically occur when the prostitute and client meet in person.

g.  Pimps at times use physical force, threats of physical force, and/or fear to control the prostitutes.  They control the prostitutes' actions, and collect money earned through acts of prostitution.  Pimps facilitate prostitution by transporting the prostitutes to locations where the prostitution occurs.  The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

h.   Prostitutes and/or pimps often stay in motels/hotels while traveling.  The prostitutes

1    and pimps travel via rental vehicles, vehicles, airplane, or bus during their travels.  The

2    pimps utilize the monies earned during acts of prostitution to purchase food, lodging,

3    clothing and other items.

4    i.    Pimps sometimes possess firearms to facilitate their sex trafficking.

5    j.    The pimps often provide drugs to the prostitutes to suppress their appetites and to assist

6    with the demands of performing sex acts for long periods of time.

7    k.    The term "daddy" is commonly used by prostitutes when referring to their pimps.  The

8    pimp's phone number is often programmed as "daddy" in the prostitutes' cell phone.

9    l.    Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols

10    that are related to the pimp's name or nickname.

11    m.    Prostitutes use cellular telephones as a way to communicate with clients.  These phone

12    numbers are included in the advertisements that are posted on various prostitution-

13    facilitating websites.  Prostitutes, pimps and clients communicate via voice calls, text

14    messages, and messages over social media platforms.

15    n.    Pimps and prostitutes use cellular telephones to transmit photographs to email accounts

16    and/or prostitution advertisement websites.

17    o.    Pimps and prostitutes use personal e-mail accounts to post their advertisements on

18    prostitution advertisement websites.

19    **III.    PROBABLE CAUSE**

20    A.    **Overview of Investigation**

21    8.    Through the investigation in this case, law enforcement has obtained evidence that Butler

22    managed the prostitution activity of then-17-year-old L.L. from the fall of 2018 to August 2019.[1]  Butler

23    took L.L. to hotels throughout Northern California and in Reno, Nevada in order for L.L. to engage in

24    prostitution for his financial benefit.  At times during his trafficking of L.L., he also managed the

25    prostitution activity of adult females, including A.M. and M.G.[2]  During the aforementioned time period,

26    Butler used the Target Cell Phone to communicate with L.L. and manage her prostitution activity.  Law

27    _____
     [1] L.L.'s true name and date of birth are known to law enforcement.

28    [2] A.M.'s and M.G.'s true names are known to law enforcement.

4

enforcement has obtained additional evidence indicating that Butler continues (1) to use the Target Cell Phone and (2) engage in the management of prostitution.

### B.   Yuba City Police stopped Butler and 17-year-old L.L. on June 1, 2019.

9.      On June 1, 2019 at approximately 11:05 p.m., Yuba City Police Department Officer Nathan Livingston conducted a traffic stop on a black sport utility vehicle driving with no lights on in Yuba City, California, in violation of California Vehicle Code section 24250.  Officer Livingston found two occupants in the vehicle.  The driver was identified as Michael Anthony Butler, a 39-year-old black male, from his California identification card.  The passenger was a white female, who was later identified during the traffic stop as 17-year-old L.L.

10.     During the traffic stop, Butler told Officer Livingston that he did not have a valid driver's license because it had been suspended for driving under the influence.  Officer Livingston later learned that Butler's license had been suspended and revoked, and that Butler was on formal probation ordered by a judge in Sacramento County for the driving under the influence offense.

11.     Butler gave Officer Livingston consent to search his vehicle.  Officer Livingston asked Butler and L.L. to exit the vehicle so it could be searched.  As Butler exited, Officer Livingston was able to see inside L.L.'s purse, where he observed several condoms.  Officer Livingston also saw three cell phones on L.L.'s seat.[4]

Butler's initial statements during the traffic stop.

12.     When Butler was outside of the vehicle, Officer Livingston and Butler discussed Butler's relationship with L.L. and what the two were doing that evening.  In summary, Butler told Officer Livingston that L.L. was his cousin and that he was driving her from Olivehurst, California, to her home in Sacramento, California.  Officer Livingston became suspicious of Butler's route of travel.[5]  Officer Livingston asked Butler why he would drive out of his way to Yuba City if he was headed south from Olivehurst to Sacramento.  Butler told Officer Livingston that his GPS took him on this route.  Later,

---

[4] Based on my training and experience conducting sex trafficking investigations, I know that sex workers and their traffickers often possess condoms because condoms are a tool of the sex trade.  Based on my training and experience, I also know that those involved in prostitution and the management of prostitution often possess multiple cell phones that they often use to communicate with prostitution clients and other participants in the sex trade.

[5] Yuba City is located north of Olivehurst and Sacramento.

Officer Livingston used his cell phone's GPS application to determine the best way to travel from Olivehurst to Sacramento.  The GPS directed Officer Livingston to drive directly south to Sacramento, rather than north to Yuba City, then back south to Sacramento.

13.     After identifying L.L. and learning her age, Officer Livingston asked Butler whether he knew L.L.'s age.  Butler indicated that he knew that L.L. was 17 years old.  At some point during the traffic stop, Butler told Officer Livingston that L.L. was just his "baby cousin."

<u>L.L.'s statements during the traffic stop</u>.

14.     Officer Livingston also spoke to L.L. when she was outside of the vehicle.  In summary, L.L. told Officer Livingston that Butler was her cousin.  However, L.L. was not able to explain the familial relationship between her and Butler.  L.L. also said that she and Butler were driving back from her friend's apartment in Olivehurst and headed to Butler's house for the night.  L.L.'s description of the pair's plans for evening was different than what Butler had told Officer Livingston.

<u>The search of Butler's vehicle</u>.

15.     Officer Livingston searched Butler's vehicle and found several items that are evidence of prostitution activity.  In the back seat of the vehicle, Officer Livingston found women's high heel shoes. In the trunk, inside a suitcase that Butler identified as his own, Officer Livingston found a purple vibrating sex toy, women's lingerie, and two condoms.  As Officer Livingston continued his search of the vehicle, he located a black "Focused Space" bag.  When he found this bag L.L. stated, "That's my bag," and gave Officer Livingston consent to search the bag.  At that time, Officer Livingston saw Butler staring at L.L. and observed L.L. ask Butler, "What?"  Butler responded, "Nothing."  Inside the bag, Officer Livingston found a Canon digital camera, a black Dell laptop, and a rose gold Apple iPhone, among other things.

16.     Officer Livingston then asked Butler if he could search Butler's body.  Butler agreed. Inside Butler's pants pocket, Officer Livingston found $1,228 in cash, a Hampton Inn hotel room key, and several hotel cards.[6]

///

---

[6] Based on my training and experience conducting sex trafficking investigations, I know that sex workers often perform commercial sex acts at hotels and motels.

L.L.'s mother's Statement.

17.     During the traffic stop, Officer Livingston contacted L.L.'s mother, F.Q.  F.Q. told Officer Livingston that L.L. was an unreported missing child.  F.Q. also told Officer Livingston that previously L.L. had been the victim of human trafficking and F.Q. feared that L.L. ran away with the subject again.  F.Q. identified two people who she believed may have trafficked L.L.: (1) a man who she identified as "KD," and (2) a man who had previously been convicted for trafficking L.L. named Kenneth McDaniel.[7]

Butler's subsequent statements during the traffic stop.

18.     After his conversation with F.Q., Officer Livingston was concerned that Butler may have been trafficking L.L.  Therefore, he detained Butler in handcuffs and placed him in the back of his patrol car.  Officer Livingston then read Butler the *Miranda* admonition.  After Officer Livingston read the admonition, Butler agreed to continue speaking with Officer Livingston.  At this point, Butler indicated that L.L. was not his cousin.  Butler said that he calls L.L. his cousin because of how close they are.  Butler also stated that he knew L.L. was 17 years old and said that he only wanted to get her home.  Butler said that he had known L.L. for only four months.  Butler said that the $1,228 in his pocket was from cashing his paycheck from his job at Dr. Greenthumbs in Sacramento, California.  When asked about the hotel room key in his pocket, Butler denied having a hotel room.

19.     Officer Livingston cited and released Butler for his vehicle code violation.  Butler's vehicle was towed.  Officer Livingston informed Butler that he would not allow L.L. to leave with him because she was a missing juvenile.  Butler told Officer Livingston that was fine.

Post-traffic-stop interview of L.L.

20.     Officer Livingston took L.L. and her belongings—which included the items in the black "Focused Space" bag that she claimed were hers—to the Yuba City Police Department.  When they arrived at the police station, Officer Livingston continued his interview with L.L.  During the interview, which occurred late in the middle of the night, Officer Livingston noted that one of the three cell phones that he had found in L.L.'s seat continued to ring or vibrate.  Officer Livingston noticed that the phone

---

[7] In a later conversation with L.L., but still during the traffic stop, L.L. told Officer Livingston that KD's real name was David Caldwell and that Kenneth McDaniel was her ex-boyfriend.

7

numbers that were calling L.L.'s phone did not appear to be saved contacts on her phone.  He also noticed that not all the phone numbers were the same.  Based on my training and experience, Officer Livingston was likely observing prostitution clients contacting L.L. on the phone used to manage her prostitution activity.  Based on my training and experience, it is likely that these calls, which occurred late at night when prostitution activity increases, were received in response to online prostitution advertisements.  At the end of the interview, L.L. told Officer Livingston that she had something to tell him.  She then told him that the black bag (containing the rose gold Apple iPhone, Canon digital camera and the Dell laptop) did not belong to her, and she asked if police could be return the bag to Butler.

### C.    Interview of L.L. on June 3, 2019

21.    On June 3, 2019, Officer Livingston met with L.L. to ask for her consent to search her phones and to conduct a follow-up interview.  L.L. provided consent for the search of her three cell phones.  During the interview, L.L. disclosed that she was an escort who has sex with men for money, and that it was both her and Butler's idea for L.L. to be an escort.  L.L. described how their prostitution business worked.  Butler was in charge of advertising L.L. on unidentified websites.  L.L. would then communicate with the men on one of her cell phones, and Butler told L.L. what prices to charge the prostitution clients.  L.L. performed sexual acts with the men and gave the money she earned to Butler.  L.L. said that she had been an escort for Butler for approximately seven months.  L.L. said that just before the traffic stop on June 1, 2019, L.L. had come from an "outcall," which she described as a prostitution encounter during which she would travel to the prostitution client to perform sex acts.  L.L. referred to Butler as her boyfriend.  L.L. said that she and Butler had been having oral sex and sexual intercourse.  L.L. estimated that they had sex approximately 20 times a month and they had been together for seven months (approximately 140 times).

### D.    Interview of L.L. on June 4, 2019

22.    On June 4, 2019, Officer Livingston spoke to L.L. again.  During this conversation, L.L. identified Butler's Snapchat name as "Spice916."[8]  L.L. also discussed how the money that she made was handled.  L.L. said that Butler told her that he was going to get all of the money.  After clients paid

---

[8] I conducted a Google search for the term "Spice916" and found music videos depicting Butler.

L.L., she wound then have to give all the money to Butler.  The men only paid L.L. in cash.  L.L. said that the money that was in Butler's pocket the night they were stopped was the money that L.L. had made that night.  L.L. said that she had three clients that night and they each paid her $350.[9]  L.L. said that Butler would pay her through shopping sprees every two weeks.  During those shopping sprees, Butler allowed L.L. to spend $200 shopping.

23.     L.L. also clarified her timeline with Butler.  L.L. met Butler at the Arden Fair Mall in Sacramento, California in September 2018.  Butler approached her and told her she was cute.  The two exchanged phone numbers.  L.L. initially told Butler that she was 19 years old, but two weeks later told him that she was really 17 years old.  Butler told her that he does not like being lied to, but he continued to talk with her.  Around that time, L.L. started working as an escort, and continued engaging in prostitution from September 2018 to March 2019, and then again beginning in May 28, 2019.

24.     L.L. also said that Butler always carried his laptop, camera, and the rose gold iPhone, all of which were found in the black "Focused Space" bag.  L.L. said that Butler took photographs of other escorts on the camera but had not taken photos of her using his camera.  L.L. said that she believed that Butler used both his laptop and his cell phone to post her (advertisements) on the unidentified websites.

**E.     Yuba City police obtained state warrants to search Butler's devices**

25.     Yuba City police obtained a warrant to search Butler's Canon digital camera, the Dell laptop, and the rose gold iPhone.  Yuba City police extracted data from the Canon digital camera and the Dell laptop.  However, they were unable to access Butler's cell phone because it had been locked.[10]

Cannon Digital Camera

26.     I reviewed the data from Butler's Canon digital camera.  There were 813 photos on the device, including several photos of Butler.  The metadata on the photos reveal that the photos were all taken between April 2, 2019 and May 30, 2019.[11]  Many of the photos on the camera depict other

---

[9] In a later interview with L.L., she said that she had only done one outcall the night of the traffic stop and it occurred in an apartment approximately 10-15 minutes from Yuba City, California.  L.L. said that she did not do any "dates" in the Hampton Inn hotel in Yuba City.

[10] On April 29, 2020, the Honorable Carolyn K. Delaney authorized a warrant to search the cell phone.  See case number 2:20-SW-379-CKD.

[11] The metadata on these photos is hidden data that the Canon digital camera captures for each individual file.  The metadata includes the camera settings and the date and time the photo was taken.  Based on my training and experience, the date and time in the metadata is generated by the date and time

females posing in hotel rooms.  The females are dressed in lingerie and revealing clothing and many are posing provocatively.  Some of the females are nude or partially nude.  The style of these photos is consistent with photos used for advertising prostitution on the internet.  To date, I have been able to identify some of the females captured on Butler's Canon camera.

27.     There are five women who appear in the various series of photos that are consistent with prostitution advertisement photos, which I found on Butler's Cannon digital camera.  Four of the women were photographed in hotel rooms and one appears to have been photographed inside of a small boat.  L.L. and A.M. both identified these photos as having been taken inside Butler's boat, which L.L. described as a Bayliner.[12]  One series of 73 photos depicts a white female who appears to be between the ages of 15 and 20 years old.  She was photographed in what appears to be a hotel bathroom in various stages of dress, to include several fully nude photos of her inside a shower.  To date, I have not yet been able to identify this female.

28.     There are also 20 photographs of L.L. on the digital camera.  According to the metadata on these photos, they were taken on May 30, 2019, and were the most recent photos on the camera.  In these photos, L.L. is fully clothed.  The photos appear to have been taken in a kitchen and in a small bar area inside of a residence.[13]

**F.     Interview of L.L. on June 11, 2019**

29.     On June 11, 2019, Yuba City Police Detective Scott Rounds interviewed L.L.  During this interview, Detective Rounds showed L.L. an advertisement from a prostitution website called SkiptheGames.com.  The advertisement was posted on June 1, 2019 at 12:09 P.M. for the Sacramento, Yuba City, Marysville, California areas and was titled "Yuba City Upscale Exotic Asian Bomb Shell Unmatched Skills."  The advertisement had several photos attached which depict a white female, who was identified as a 21-year-old named "China."  In these photos, the white female is wearing some form of lingerie, with the exception of one photo in which her breasts are exposed.  The advertisement further

---

setting on the camera, which is a manual settings and can therefore be inaccurate.

[12] A.M. knows Butler only by his street name, "Spice."

[13] The photos of L.L. that were found on the Canon digital camera are not the same photos law enforcement has found in prostitution advertisements on the internet, and they are not consistent with photos used to advertise for prostitution.

describes China's physical characteristics, her availability to do in-calls and out-calls 24 hours a day.

The advertisement also contains the following message:

> Hello My Name Is China Im A True Provider With Unmatched
> Skills and Qualities Im that rare gem youve been searching for
> with beauty and smarts Let me stimulate your mind, body, and
> soul. I aim to please, and I also specialize in the art of Pleasure. If
> your looking to have fun with a beautiful playmate look no further
> give me a call. 100% INDEPENDENT 100% Real Pics! Unrushed
> Sessions! No Disappointments! Satisfaction Guaranteed! Call Me
> 916-562-8158 China

30.   L.L. identified herself as the person depicted in the photos on the above-described prostitution advertisement.  L.L. said that she uses the name "China."  L.L. told Detective Rounds that Butler created the advertisement.  L.L. also indicated that she gave Butler permission to create the advertisement.  L.L. said that she could recall five or six cities she traveled to with Butler.  The farthest she traveled was Monterey, California.  She also identified Sacramento, California as an area where Butler had taken her.  L.L. said that she was not aware of any other girls that Butler pimped who were under the age of 18, and she indicated that all of the other females looked older than 18.

31.   I conducted an online search for prostitution advertisements related to L.L.  I initially located approximately 260 online advertisements containing photos of L.L.  The advertisements were posted almost daily from November 30, 2018, to February 25, 2019.  The advertisements began again on May 30, 2019, and ended on June 1, 2019, which was the evening that Officer Livingston recovered L.L. during the traffic stop.  Most of the advertisements I located were posted for the areas around Sacramento, San Jose, Santa Cruz and Monterey, California, which is consistent with the areas that L.L. recalled traveling to with Butler.  In addition, the dates of these advertisements are also consistent with the dates that L.L. said she worked as an escort for Butler.  Based on my training and experience, victims of sex trafficking often lose track of days and even months, as well as locations where they have been trafficked.  This is often a consequence of their transitory lifestyle, which involves frequently moving from one hotel room in one city to another hotel room and city.

///

///

11

### G.      August 11, 2020 Interview of L.L.

32.      On August 11, 2020, Detective Rounds and I interviewed L.L. again.  During this interview, I asked L.L. to look at several photographs I had obtained from various places, including Butler's Canon digital camera and his Dell laptop.  Among these photographs were photos of the residences located at 7719 52nd Avenue, Sacramento, California (the "52nd Avenue Residence"), and 7818 51st Avenue, Sacramento, California (the "51st Avenue Residence").  L.L. indicated that the photograph of the 52nd Avenue Residence depicted Butler's residence.  In that photo of the 52nd Avenue Residence there is a silver sedan parked in the driveway.  L.L. identified this vehicle as Butler's Lorinser edition Mercedes.  L.L. said that Butler had driven her to prostitution dates in this vehicle on several occasions.  I have also observed this silver Lorinser Mercedes sedan with California license plate number 7RHL889 parked in the driveway of the 52nd Avenue Residence.  I have also reviewed California Department of Motor Vehicle (DMV) records that indicate that this vehicle is registered to Cathy Lachelle Douglas at the 51st Avenue Residence.

33.      When I showed L.L. a photograph of 51st Avenue Residence, she identified it as Butler's mother's residence.  L.L. identified Butler's mother as "Cathy."  L.L. said that Cathy knew that Butler was prostituting her and other girls and would babysit Butler's children, whom he had with another female, M.G.,  so that M.G. could also go out and engage in prostitution for Butler.

34.      I also showed L.L. four photos of L.L. in which she identified herself in different places in Butler's residence.  In two of these photos, L.L. identified herself with M.G. on Butler's bed in Butler's bedroom.  These photos depict both M.G. and L.L. wearing lingerie.  One of these photos depicts M.G. kneeling on the bed with L.L. kneeling on top of M.G. and kissing M.G. on the buttocks.  The second photo depicts L.L. lying down on her back facing the camera with M.G. leaning into her.  It appears as though M.G. is kissing L.L.'s cheek.  The metadata on these two photos reveal that they were taken on December 20, 2018.

### H.      Butler Uses the Target Cell Phone to Conduct His Illegal Prostitution Business
#### Butler recruited victims using the Target Cell Phone.

35.      Through the course of this investigation, I have viewed videos of Butler that have been posted on the website YouTube.com.  YouTube is an Internet-based video sharing website and

application that is owned by Google, Inc.  There are five YouTube videos depicting Butler that were

uploaded by YouTube user "Spice223s."  All five Spice223s videos, which were posted on YouTube

between approximately three and seven years ago, depict Butler.[14]

36.     I reviewed a video titled "IMG_1583," which was posted on June 23, 2013.  In this video,

Butler guides a tour of a hotel suite.  In the video, Butler claims that the suite is located at the Hyatt

Regency in Monterey, California.  Butler claims he paid $500 per night to rent the suite.  Near the end of

the video, Butler states the following:

> This video is for all the faggot bitches out there, know what I'm
> saying, that be hoeing ya'll asses off and escorting ya'll asses off
> and ya'll don't got nothing to show for it.  Ya feel me.  Fucking with
> a nigga that ain't giving ya nothing.  Bitch.  Come fuck with Spice,
> bitch.  As you can see, I got lots of room for you hoes.

At the end of the video, Butler provides his cell phone number, the Target Cell Phone, followed by the

statement "call me, bitch."

<u>Butler's iPhone that was seized on June 1, 2019 was previously assigned the</u>

<u>Target Cell Phone's call number.</u>

37.     I reviewed the data contained in Butler's rose gold Apple iPhone, which was seized on

June 1, 2019.  The device's data indicates that the Target Cell Phone number was previously assigned to

this device, which Yuba City Police Officer Livingston found in a bag in Butler's trunk along with

Butler's Canon digital camera and Dell laptop.

<u>Butler communicated with L.L. using a cell phone device that was then-assigned</u>

<u>the Target Cell Phone's call number.</u>

38.     I have reviewed the data contained in L.L.'s iPhone 6S, which L.L. gave to Yuba City

police on June 3, 2019.  L.L.'s Apple iPhone 6S' data includes an Apple iMessage (text) conversation

with the Target Cell Phone in the hours before Yuba City Police recovered L.L. on June 1, 2019.  L.L.

and Butler used a code to communicate about when L.L. had arrived at a prostitution client's room and

when the client had finished.  In an interview with Yuba City Police in August 2019, L.L. explained that

---

[14] I am familiar with Butler's physical appearance by, among other things, reviewing Butler's
California DMV photo.

a text with the number "1" meant that she had arrived at the client's room.  And a text with the letter "D" meant that she had completed the date.  I found text communications between L.L. and the Target Cell Phone on June 1, 2019 that are consistent with what L.L. described.

39.     L.L.'s Apple iPhone 6S also contains text conversations during which Butler and L.L. discussed the fact that after the June 1, 2019 traffic stop, L.L. would be put in a foster home.  In this conversation, L.L. called Butler "Daddy," which is a term that sex workers often use to refer to their pimp.  Also in the conversation on June 2, 2019, L.L. asked Butler if it was his mother's birthday.  According to California DMV records, Cathy Douglas' birthday is June 2.

40.     Set forth below are excerpts of the conversation between L.L. and the user of the Target Cell Phone on June 2, 2019:

> Butler: Hey are you ok
>
> L.L.:     Yea they put me in a foster home
>
> L.L.:     Are you okay?  They kept trying to get me to tell them stuff but I didn't say shit
>
> Butler: I thought your mom was coming to get
>
> Butler: I told them I was tryin to take you home but they didn't believe me
>
> *     *     *
>
> L.L.:     Tomorrow the cps people from where I'm from are gunna be here in the moring I think
>
> L.L.:     Like 12 tomorrow
>
> Butler: That's cool
>
> L.L.:     Today's your moms birthday huh

<u>The Target Cell Phone is listed on hotel records between 2018 and 2020.</u>

41.     Through the course of my investigation, I have reviewed evidence indicating that Butler and M.G. have rented and stayed in hotels in locations in the Eastern, Northern and Central Districts of California and in the District of Nevada.  Specifically, L.L. and A.M. disclosed that Butler rents these rooms at hotels in or order to manage ongoing prostitution activity.  L.L. and A.M. described how Butler moved his prostitution operation from city-to-city, with his victims often engaging in prostitution at

hotels.

42.     A.M. reported that she engaged in prostitution under Butler's control from approximately June 2019 to August 2019.  At the time, A.M. was 19 years old.  A.M. reported that at the time, Butler was also managing the prostitution activity of 17-year-old L.L. and adult M.G.  A.M. disclosed that in July 2019, the aforementioned group traveled from California to Reno, Nevada in order to engage in prostitution at hotels and casinos in Reno.

43.     In the course of this investigation, I have reviewed hotel records indicating that Butler rented many hotel rooms in Northern California and Reno since late 2018.  I have seen numerous hotel records indicating that Butler listed the Target Cell Phone as his contact telephone number.

<u>The Target Cell Phone was recently used as part of Butler's pattern of managing prostitution.</u>

44.     As a recent example, the Target Cell Phone is listed on records provided by the Best Western in Yuba City, California.  The records indicate that M.G. checked into the Yuba City Best Western on or about June 17, 2020.[15]  During an interview with A.M. on September 22, 2020, A.M. reported that Butler would have M.G. check into the hotel rooms for Butler, because Butler was not supposed to be seen at the hotels.   I have also seen prostitution advertisements which depicted M.G. posted in Yuba City, California on June 17 and 18, 2020 on the website privatedelights.com.

45.     M.G.'s recent presence at the Yuba City Best Western and the aforementioned prostitution advertisements are consistent with Butler's and M.G.'s pattern of using the Best Western (and other hotels) to engage in prostitution.  On August 1, 2019, A.M. reported engaging in prostitution under Butler's control at that same hotel.  A.M. reported that M.G. and L.L. were also at the hotel with Butler.  Shortly after A.M.'s August 1, 2019 report to the Yuba City police, an officer found L.L. at the Yuba City Best Western, and L.L. disclosed that she was there to engage in prostitution under Butler's management.  Yuba City Best Western records confirm that Butler rented a room at the hotel on August 1, 2019.

///

---

[15] This is M.G.'s last stay at the Best Western in Yuba City, California.  According to the manager, M.G. was added to the "DNR" (do not rent) list after another guest at the hotel complained that M.G. was "working" out of the room and complained about the foot traffic coming and going from her room.

1          Butler recently brought females to a Sacramento hotel.

2          46.     On August 12, 2020, I received a phone call from the manager of the Residence Inn Cal

3    Expo, which is located at 1530 Howe Avenue in Sacramento.  The manager told me that Butler had

4    stayed at the hotel on August 10, 2020, and that Butler was attempting to stay at the hotel again on

5    August 12.  The manager declined to rent a room to Butler and watched Butler depart the hotel property.

6    The manager saw Butler get into the back seat of a green Honda Accord.  Seated next to Butler in the car

7    was a younger African American girl and the driver was an older looking Hispanic female.  During my

8    interview with L.L. on August 11, 2020, L.L. identified this hotel as the first place that she engaged in

9    prostitution under Butler's management.

10         The Target Cell Phone is a contact number on Butler's Comcast account as of July 22, 2020.

11         47.     I have reviewed Comcast Corporation subscriber records for an account at the 51st

12   Avenue Residence.  Comcast records indicate that based on records reviewed for the time period

13   January 1, 2018 through July 22, 2020, Michael Butler is the subscriber for Comcast services at the 51st

14   Avenue Residence.  As of July 22, 2020, the Target Cell Phone is listed as a contact number for Michael

15   Butler's account.

16         Butler's mother is the subscriber for the Target Cell Phone

17         48.     I have reviewed subscriber and toll records for the Target Cell Phone.  These records

18   include subscriber and toll data through September 21, 2020.  These records indicate that since August

19   2, 2009, the subscriber for the Target Cell Phone has been Cathy Douglas at the 51st Avenue Residence.

20         49.     The subscriber records for the Target Cell Phone also indicate that the number assigned

21   to the Target Cell Phone has been linked to multiple International Mobile Equipment Identity (IMEI)

22   numbers.  IMEI numbers are unique numbers assigned to cell phone devices.  This means the number

23   assigned to the Target Cell Phone has been assigned to multiple cell phone devices since August 2,

24   2009.  Based on my training and experience, I know that this could mean that over the years, the user of

25   the Target Cell Phone transferred the user's telephone number—possibly by transferring a SIM card—

26   from one cell phone device to another.  Based on my training and experience, I know that it is common

27   for individuals to transfer an existing cell phone number to a new cell phone device.  I also know that it

28   is common for cell phone users to transfer the data from an existing cell phone to the new cell phone

device.  Based on my training and experience, I know that the cell phone user can accomplish this data transfer from an existing cell phone device to a new one by transferring the cell phone's SIM cards and downloading the old device's data from a cloud storage account (for example, an iCloud account), or by enlisting the assistance of a representative of the cell phone retailer, manufacturer, or the cell phone service provider.  Accordingly, there is probable cause to believe that evidence of Butler's prostitution of L.L.—including, for example, electronic messages and photos— and others, in addition to evidence of his ongoing prostitution management, will be located on the Target Cell Phone, despite the fact that since August 2019, Butler has obtained a new cell phone device.

50.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

51.     Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available.

52.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication

a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## IV.    <u>AUTHORIZATION REQUEST</u>

53.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

54.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

55.    I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B

unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

56.   I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

57.   I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Matthew Catalano

Matthew Catalano
Special Agent
Federal Bureau of Investigation

Subscribed and sworn by telephone:   9/30/2020

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

/s/ Brian A. Fogerty
Approved as to form by:
Assistant U.S. Attorney Brian A. Fogerty

In addition, to ensure technical compliance with 18 U.S.C. §§ 3121-3127, I also request that this warrant shall also function as a pen register order.  I thus certify that the information, under oath, that likely to be obtained is relevant to an ongoing criminal investigation conducted by the Federal Bureau of Investigation, based on the agent's affidavit herein.  *See* 18 U.S.C. §§ 3122(b), 3123(b).

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number (916) 604-1056 (the "Target Cell Phone"), whose wireless service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey.

   Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in Attachment A
for a period of thirty days, during all times of day and night.  "Information about the location of
the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude
data, and other precise location information, as well as all data about which "cell towers" (i.e.,
antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers)
received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter,
"Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is
required to disclose the Location Information to the government.  In addition, T-Mobile must
furnish the government all information, facilities, and technical assistance necessary to
accomplish the collection of the Location Information unobtrusively and with a minimum of
interference with T-Mobile's services, including by initiating a signal to determine the location
of the Target Cell Phone on T-Mobile's network or with such other reference points as may be
reasonably available, and at such intervals and times directed by the government.  The
government shall compensate T-Mobile for reasonable expenses incurred in furnishing such
facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this
warrant, the Court finds reasonable necessity for the seizure of the Location Information.  See 18
U.S.C. § 3103a(b)(2).

**II.      Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 18
U.S.C. §§ 1591(a)(1), (b)(2), Sex Trafficking of a Child, 18 U.S.C. § 1952(a)(3), Interstate
Travel or Transportation in Aid of Racketeering Enterprises, and 18 U.S.C. § 2421, the Mann

Act, involving Michael Anthony Butler, Jr.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| INFORMATION ASSOCIATED WITH THE ) | Case No.    2:20-sw-0896-AC |
| CELLULAR TELEPHONE ASSIGNED CALL ) | |
| NUMBER (916) 604-1056 ) | **SEALED** |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ New Jersey _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**
This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A), and 2711(3)(A).  Because the government has satisfied the requirements of 18 U.S.C. § 3122, this warrant also constitutes an order under 18 U.S.C. § 3123.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for   30   days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     9/30/2020 at 11:02 a.m. _____

City and state:      Sacramento, California _____

**ALLISON CLAIRE**
**UNITED STATES MAGISTRATE JUDGE**

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
Signature of Judge                                                        Date

## <u>ATTACHMENT A</u>

### Property to Be Searched

1. The cellular telephone assigned call number (916) 604-1056 (the "Target Cell Phone"), whose wireless service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey.

   Records and information associated with the Target Cell Phone that is within the possession, custody, or control of T-Mobile.

## ATTACHMENT B

### Particular Things to be Seized

### I.       Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government.  In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  See 18 U.S.C. § 3103a(b)(2).

### II.       Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 1591(a)(1), (b)(2), Sex Trafficking of a Child, 18 U.S.C. § 1952(a)(3), Interstate Travel or Transportation in Aid of Racketeering Enterprises, and 18 U.S.C. § 2421, the Mann

Act, involving Michael Anthony Butler, Jr.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.